## Western Casualty & Surety Co. v. Sales.

Jan. 23, 1945.

Davis, Boehl, Viser & Marcus for appellant.

Grover G. Sales and James W. Stites for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

Appellee, plaintiff below, in suit instituted against Meyer Heating and Plumbing Company, Peter H. Meyer, Jr., and appellant, sought to recover for services rendered the plumbing company in the construction of buildings at Camp Atterbury, Indiana. His claim as to appellant is based on assertion that it is liable for payment for services rendered, under its guaranty contract.

The case was tried before a jury, that body returning a joint verdict for $3,500, upon which judgment for plaintiff was rendered. The surety appeals on the ground that it should have had a favorable peremptory instruction, since as a matter of law appellee was not entitled to recover from it any sum whatever. Cross-appeal is prosecuted on the ground that the award was inadequate.

The undisputed facts show that the Meyer Company was engaged in the plumbing business in Louisville. Prior to March 1942, the Government began construction of buildings at Camp Atterbury, under general contract with A. F. Blair who subcontracted to Meyer Company the plumbing and heating. Following the practice Blair demanded, and there were executed ''pay and performance'' bonds in the usual form, totaling approximately $390,000, the consideration fixed in the Blair-Meyer subcontract, with Meyer Company and Peter Meyer, Jr. principals and appellant, surety. The question presented requires quotation of only that part reading:

''Now, therefore, if the principal shall promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said contract * * * then this obligation is to be void, otherwise to remain in full force and virtue.''

After stating the above, and qualifying facts, appellee alleged that beginning in May 1942 at the instance of the Meyer Company ''he rendered services and performed labor in the prosecution and carrying out of the contracts * * * for which the Meyer Company agreed to pay him a reasonable remuneration; that said services were not legal, but in the nature of labor and supervision required in the carrying out said contracts.'' Further that the Meyer Company had failed and refused to pay any part thereof. As to appellant it was charged ''that by reason of the surety bonds appellant was obligated for the payment of $22,500; that payment had been refused by surety in whole or in part.'' The prayer sought judgment against the Meyer Company and appellant.

At the outset it is shown that appellee, a reputable attorney, had also extensive business experience; he had been president of a bridge company and a coal mining company; was director of a bank, and secretary of a large mercantile establishment. There can be little doubt but that he was qualified to become, as he is called

in brief, "the supervising executive" in undertaking completion of the Meyer contract under the following circumstances: Meyer's part started soon after execution of the bonds. Such materials as had been furnished were by the Central Supply Company of Indianapolis. Appellee was Mr. Meyer's attorney and close friend. Before the work had progressed for any appreciable time Meyer, president of the concern, and in supervisory charge of carrying out its contracts, became seriously ill. About May 31, the Supply Company shut off supplies, because there were unpaid bills of $34,000. Mr. Meyer, admittedly unable to attend to business, requested appellee to take over the job and do everything necessary to complete the contract with Blair, who was threatening to call on appellant to take over. Appellee objected, but finally consented, first going to the project in company with appellant's agent representative in Louisville, who was urging appellee to do everything possible to prevent the unloading of the contract on appellant, and later, if not at the time, approving the arrangement. Appellee's first job was to raise money to meet the obligations.

After a conference with Mr. and Mrs. Meyer concerning plans to procure funds, and with the assistance of appellant's agent, a bank advanced $34,000 on a note executed by Mrs. Meyer and appellee, and the supply account was promptly paid. This saved the contract, and from that time, about June 1, 1942, appellee continued to render services either until September or until the completion of the contract in November.

Appellee says that on an average of twice each week during the time, he went to the Camp, inspecting the work, conferring with the foremen of the Meyer Company and Blair, planning the carrying on of the work, and using his efforts to complete the work as per contract. That a great part of his working time during the period was at Meyer's office, in conference with insistent creditors seeking payment of their accounts, and where appellee endeavored to raise funds to meet payments of labor and supply bills, necessary because Government estimates were far below the actual expenditures. Appellee negotiated a loan from the R. F. C. to the extent of $75,000. During the period the weekly payroll went as high as $50,000, until some time in September, when the pressure became too strong, and a payroll of $9,000 passed, because, it is said, of the low estimates of the

Government. It was about this time that the surety, upon Blair's insistence, took over. It appears that there was a conference with the attorney for appellant, who was satisfied with appellee's services on the job, and who requested him to carry on "with his organization in a manner consistent with his previous activities." In confirmation of suggestions made in conference, counsel on September 23, 1942, wrote a letter which was stated to be a result of Blair's insistence to the surety to assume the contract. In this letter they wrote the Meyer Company:

"As a result of this notice, therefore, the Western has been compelled to enter into the picture, but in accordance with our understanding with Mr. Sales, the Western is not taking over the management of the job in any way. The work on this job will continue, so far as the Western is concerned, to be managed, supervised and conducted by Mr. Sales and Blair as heretofore; the only interest which the Western has is in connection with the finances; that is the conservation of the proceeds of the contracts and their application to the proper indebtedness and liabilities in connection with the job. Arrangements entirely satisfactory to the Western have been made to this end with Mr. Sales and everyone concerned is proceeding on the basis of those arrangements."

Appellee testified that while he had a superintendent on the job who was familiar with the plumbing and heating business, he was the "executive superintendent," in complete control of operations; the one who had to carry on the job, settle difficulties and see that payrolls were met. He went to the plant "time and time again to see that supplies were there and the cost of labor kept down." At one time when one superintendent's work was unsatisfactory to Blair, after conference Blair loaned appellee one of his foremen. He says that his conferences with insistent creditors, meeting payrolls, weekly visits to the project, took "a world of time and caused anxiety and worry." He was of the opinion, as were others, that by his supervision of the work, handling the financial end, etc., he had saved the surety around $200,000. It was also shown that appellee neglected his legal business to lend his efforts to the completion of the contract. Appellee says that he performed such services as would have been performed by Mr. Meyer, if he had not suffered a totally incapacitating illness.

The foregoing is a fair resume of appellee's testimony, insofar as his services are concerned. Some of his testimony and testimony of others, relates to the reasonableness of compensation. On cross-examination appellant introduced a contract (about June 17) between the superintendent who was loaned by Blair, P. H. Meyer, Mrs. Meyer and appellee. Stress is laid on that portion which provided that Burns "shall be recognized as the head of the Meyer Company's organization at Camp Atterbury, with the sole right to execute subcontracts, if any, for pipe covering for said Meyer Company, and with the right to exercise my best judgment as I see fit, including the right to hire and fire, according to the best interest of all concerned * * *." Burns, while saying that appellee did little supervising, admits that he was at the Camp on the average of once each week until the middle of August, when Burns quit the job.

It was shown and is contended by appellant, that the subcontractor had "gone broke" before the job was finished; that Mr. Meyer was an expert in the plumbing and heating trade; that after September 4, appellee had no further responsibilities in connection with the work, by raising money or otherwise, except the foreman would report to him every week; that he had no arrangement with the Meyer Company as to payment, and had never submitted a bill to them until the work was completed, and that he knew if he received pay at all it was to be from appellant. Some proof was to the effect that appellee had little to do with the superintending, or if there was supervisory work of the character that might constitute "labor," it was materially minimized, this raising an issue of fact.

In discussing the only question involved on the appeal, admittedly one of law, it is not contended that no services were rendered by appellee in connection with the fulfillment of the contract, but that they were not such as constituted labor under the bond, and were such as should and would have been rendered by Mr. Meyer, as contractor if he had not suffered a stroke. Appellee contends that Mr. Meyer had the right to employ and pay him for such services as he (Meyer) might have performed. The contracts seem to be broad enough to permit such procedure. We shall eliminate extended discussion of suggestion made by appellant, that such services as were rendered by appellant were wholly in self-

interest, that is, to prevent a possible loss to him as surety on the $34,000 note. This no doubt had some effect and may have spurred activities, though it appears that according to appellee he might otherwise have limited his exposure to extreme liability. There is enough proof adduced to show that whatever appellee's motives, appellant was, until completion of the job, saved some embarrassment. We are concerned with the question as to whether appellee rendered some service which would entitle him to recover, even though he did no welding, use a pipe wrench, or wipe a joint.

The difficulty when confronted with this question is aggravated by the fact that many of the cases touching the subject deal with labor, supplies and mechanics' lien statutes of different states; with bonds of varying provisions, and facts which vary in proportion to the number of cases reviewed. This may be observed by a casual reference to Words and Phrases, Perm. Ed., under ''Labor and Material, Laborer, and Labor Claims,'' and to notes under sec. 270b, Title 40 U. S. C. A. We noted the lack of unanimity in Mid Continental Petroleum Corporation v. Southern Surety Co., 223 Ky. 501, 9 S. W. 2d 229.

Here appellant relies upon Mining Co. v. Cullins, 104 U. S. 176, 26 L. Ed. 704; United States ex rel. v. United States Fidelity & Guaranty Co., 139 App. Div. 262, 123 N. Y. S. 938; Banker's Surety Co. v. Maxwell, 4 Cir., 222 F. 797; Hardaway v. National Surety Co., 211 U. S. 552, 29 S. Ct. 202, 53 L. Ed. 321; Look v. City of Springfield, Mass., 198 N. E. 661, and other cited cases, distinguishing Bond v. W. T. Congleton Co., 278 Ky. 829, 129 S. W. 2d 570, the latter being relied upon by appellee, and which we think is persuasive. Counsel for appellee undertakes to distinguish each of the cases relied upon by appellant, and with some effect demonstrates that under the facts of this case the authorities tend favorably to sustain his position. It may be noted in the Cullins case one Kentucky case is cited as showing that architects are not of the favored ''labor'' class (Foushee v. Grigsby and Robinson, 12 Bush 76), though such holding is of the minority.

It would serve no good purpose for us to undertake to follow parties in undertaking to distinguish cited cases, many of which turn on provisions of various contracts, bonds, and statutes relating to liens or priorities.

It may be suggested here that we have no question of liens or priorities or construction of statutes. Such cases as so relate are helpful only insofar as the courts have placed their varied interpretations on the question of what constitutes labor. And as we have observed the numerous opinions, many courts have given strict and narrow construction to the words, while others have followed the almost universal rule that a contract of indemnity executed by a surety for compensation as contra to an accommodation surety, must be construed liberally toward the assured. Southern Exchange Bank v. American Surety Co., 284 Ky. 251, 146 S. W. 2d 203. Perhaps an exemplary extreme case, under this rule, is Lowenstein v. Meyer, 114 Ga. 709, 40 S. E. 726, holding a bartender who also kept books in connection with his duties, as such was entitled to a laborer's lien. Less extreme is Cohen v. Aldrich, 5 Ga. App. 256, 62 S. E. 1015, where a stenographer to an assistant manager of a corporation was a laborer whose wages were not subject to garnishment. It has been held that a foreman of a logging camp was performing preferential labor, as in Look v. City of Springfield, supra, and others holding that the word "labor" as used in the statutes, or in bonds for payment, is comprehensive enough to include one who works with head or hand or both.

Counsel for appellant cites and relies upon cases which indicate (some of them) that the word should be confined to those who exercise purely bodily or physical manual toil, and do not embrace those who merely exercise the mental faculties, such as superintendents, foremen, architects and the like. The reasoning in the contra cases is more appealing and serves to reach the purposes of such bonds as the one in question, to see that the one who lends his labor, mental or physical, to the completion of a structure shall receive his hire. As is said in Phoenix Furniture Co. v. Put-in-Bay Hotel Co., C. C. Ohio, 66 F. 683, 685: "There is no reason * * * why the architect who * * * puts upon paper the design for such an immense building (and superintends the work), should not be protected in his contribution * * * of such work, as well as the carpenter, the plumber, the painter * * * who performs manual labor. The court certainly ought not to strain the statute to exclude labor of this high character * * * unless it is plainly the intent of the legislature that it should bear such interpretation." One who draws such plans for a building actually does work

upon it as if he had carried a hod. Read v. Whitney, 45 Ont. L. R. 377.

Perhaps the most applicable case cited by appellee from other jurisdictions is a Texas case, Massachusetts Bonding & Ins. Co. v. Steele, Tex. Civ. App., 293 S. W. 647, 648, because of striking similarity in facts and character of services rendered by Steele. There the contractor had employed Steele to superintend the erection of a school building, in keeping time of laborers, paying them, promptly providing materials, and looking to other matters naturally arising in the work of construction. He was held entitled to preference for his services. The point was made there that the duties performed by Steele logically fell upon the contractor, who was not to be preferred or protected. The court answered the contention thus:

"A public work * * * might be of such proportions that the contractor could not superintend such work, or he might by reason of other work or other duties be unable to superintend the work in person, and in each case, where the contractor employed another to superintend, and said employee does perform labor in superintending, in the prosecution of such work, there is no sound reason why such labor should not be protected."

United States Fidelity & Guaranty Co. v. American Surety Co., 25 F. Supp. 280, holds a superintendent to come within the terms of a payment bond, on the idea that the word "labor" may under circumstances include mental as well as physical effort. The Steele and Look cases are cited with approval. The analogy in the Steele case and the one we have is striking, except that as is admitted by appellant in brief that Meyer was totally physically disabled to such an extent that he could not look to the carrying on or completion of his contract. We see no reason why he should not employ one in whom he reposed confidence to do that which it is admitted he might have done had he been physically able. It is not insisted that anything in the contract with Blair would militate against this.

Appellant contends that the Bond-Congleton case, relied upon by appellee, is not applicable, but is rather indicative that under the facts here appellee was not entitled to be paid for his services. This because under Congleton's contract he was to be paid on a basis of 10% in addition to costs of labor and material furnished. This

was treated as profit or a part of the contract price. Counsel argues that there was no such contract in the instant case, and this is correct. In that case Congleton was declared a lien superior to that of Bond, a mortgagee. The applicable point in the opinion is the ruling that a contractor himself necessarily performs labor in the purchase and paying for the labor and materials in the construction of a building, and the court found it reasonable to conclude that such labor was entitled to preference as much as any other labor that goes into the building. In this case there can be little doubt but that Meyer had the right to employ some one to take his place, certainly where the whole arrangement was well known to appellant's agent and attorney, and without objection.

Coming to the cross-appeal, we are of the opinion that it is not meritorious. It appears from the record that appellee was given the benefit of as favorable instructions as were justified under the facts. The court did not specifically mention the matter of services rendered by appellee in the borrowing of funds. Some cases hold that banks or persons lending money for the purpose of carrying out the construction of a building are entitled to a lien or to recover on a bond; others hold to the contrary. While this effort was accompanied with labor and expended time, it is more the business of a broker or an attorney, and could hardly be classed as preferential labor, or as coming under the most liberal construction of the obligation. The jury may have had the same notion. Again, while appellee claimed for services from some time in the latter part of April till November, there are sufficient grounds for concluding that his services after September 4, 1942, were not appreciable. We are not inclined to disturb the jury's verdict in the absence of a showing of passion or prejudice, or something which would lead us to the conclusion that the trial judge who expressed surprise at the smallness of the verdict, committed error in overruling appellee's motion for a new trial.

Judgment affirmed on original and cross appeal. The whole court, except Judge Latimer, sitting.

Judges Thomas and Harris dissenting.